Thank you, Your Honors. May it please the Court, I'm Amber Rosen representing the United States in this matter. This is a government appeal from the District Court, suppression of evidence obtained pursuant to a warrant to search the defendant's home for child pornography. The excised affidavit in this case established the defendant received nine emails over the course of ten months containing 53 attachments with images and films of child pornography and child erotica, that he received these emails at two different screen names at multiple times, and that these same emails and defendant's email address were found on the computers of two different child pornography collectors living on two different continents. Even while acknowledging all of this evidence, the District Court found that probable cause was lacking on the basis that the affidavit did not contain direct evidence that defendant's receipt of the affidavit's finding, the District Court did not have the benefit of this Court's en banc decision in Gord. And that is significant because Gord specifically allows the inference that the District Court thought it could not make. Gord held, as I'm sure this Court is aware of the Gord panel. Breyer. Well, we're both on the Gord panel. Kelley. Yes. Breyer. But I think Gord is quite different. Gord, there's no doubt that he joined this website. He paid money to join the website. He received the images that were on the website. And here, it's unsolicited email, at least according to what we have in front of us. Right? Why isn't that a significant difference? Kelley. Your Honor, I think it's – there is a difference, but I think it's not significant for this reason. In Gord, the Court found there were two things that were clearly established by the affidavit. First, that the website the defendant had joined had child pornography, although it also had legal adult pornography as well as child erotica. And secondly, that the defendant had and wanted access to the website as evidenced by his paying membership. And it said it only needed to infer one thing, and that was because there was no direct evidence that the defendant had, in fact, downloaded or received the child pornography or possessed it, the child pornography that was on the website. And so it said from that evidence, from defendant's desire and access to child pornography, it could infer the receipt or possession. Here, the situation is that we have direct evidence. The affidavit clearly established that the defendant received child pornography, and the question was, did he receive it knowingly? In other words, can we infer his interest? How is this any different from Weber? I mean, Weber, we're talking about snail mail. It came through the Postal Service, confiscated. He didn't receive it. There was no evidence that the defendant solicited it, and it was suppressed. And we sustain that. Why isn't that exactly like this case? Oh, I think Weber is very different from this case. First of all, you have the amount of the child pornography at issue. In Weber, the only thing they had was this past occurrence two years prior where it wasn't even clear that it was child pornography, and it was clear they knew that the defendant had not, in fact, received it because he didn't pick up the unclaimed mail. Then they had that he had ordered some of what appeared to be child pornography, but the titles actually didn't even suggest it. They were somewhat ambiguous and had titles like piccolo and chicken. And they knew that the defendant hadn't yet received it because they were going to do the controlled delivery. But in Weber, you have a volitional act. At least you had a volitional act of the may or may not have been pornography. That's true. Here, we just have no, according to the evidence that we have in front of us, no volitional act, do we? I think that's where the significance of Gord comes in, because it says the court can make reasonable inferences. All we need is a fair probability that defendant wanted the e-mails he received. And I hear, I think there was significant evidence from the totality of the circumstances from which the court can make that inference, and the significance of Gord ---- No. I mean, it cannot be ---- You have to ignore that. You have to ignore the one paragraph which describes the evidence that the agents had found in the courts, the first warrant where they found pornography in his AOL account. Yes, that was clearly excised from the affidavit, and this Court should not consider it either. And so let me talk about it a little bit, what the totality of the circumstances is, from which that inference can be made. First, as I say, is the importance of the amount. In Weber, for example, it was just one order. Here we have nine e-mails. They were received at different times, the first four around November of 2003. How do we know it's around November of 2003? Well, I have two reasons. Well, the computer was rated in Germany at that time. But I didn't see any evidence on the record, maybe you can point to some, that gave the dates of those e-mails that were found on there. Now, in the second ---- the second batch, there's a specific date. I guess it was called August, is that right, of 2003? Yes. But where's the evidence that the e-mails were sent in November of 2003? You're right. That the evidence ---- the first affidavit had that detail. The second affidavit, which this Court needs to rely on, did not have that detail. But the district court even asked defense counsel in this case, isn't it a reasonable inference that the e-mails were received by defendant around 2003, given that the And defense counsel said ---- Your answer is, not to interrupt, but your answer is, basically, we don't know, but it's a reasonable inference. Exactly. And the defense counsel even conceded that. And that's at page 220 of the excerpts of record. So I really think that's not an issue. I think that was a reasonable inference under Illinois v. Gates. Courts say that warrants don't need to be read with hyper-technical, but should be read with their common-sense inferences. So I think that the dates aren't really so much of an issue. The inferences from which you can infer that there was a ---- all you need is a fair probability, not even more likely than not, that the defendant wanted these e-mails is 53 images. This Court has held in a drug context that a ---- when a defendant possesses a large quantity of narcotics, that alone will support a finding beyond reasonable doubt that his possession was knowing. Here we have a large quantity of child pornography. And so from that, I think the Court can infer by only a fair probability that defendant's receipt and possession of those was knowing. So that's the first. The second is the narrow focus of the e-mails that defendant received. Fifty-two of the 53 images were of young boys. From that, the Court could reasonably infer that there must have been some prior communication between the recipient and the sender for the sender to know defendant's particular sexual proclivities. That's a reasonable inference and similar to one made in Hay. In United States v. Hay, defendant received 19 images. The Court inferred that there must have been prior ---- and also that Hay, he hadn't taken any affirmative action. The Court inferred that he solicited ---- Sotomayor, it's true. It wasn't an e-mail transmission, which does, in fact, suggest prior communication. Exactly. But I think that the suggestion of prior communication, there's evidence to support that inference here, too. Where? Based on, as I'm saying, based on the fact that all of the e-mails, except for one, were of young boys. That indicates that ---- Why does that indicate ---- I see what you're saying. But still, if we're talking about, to cut to the chase of this, there's so much span. Thirty percent of all e-mail messages are spanned. There's a high degree of pornography in span. And if basically the government's position is the receipt of spam alone, if it resides in your e-mail account, is enough to justify a reasonable suspicion to underline that, then we're ---- it's a fairly broad rule. No. And that is not what we're suggesting. Our entire point is that it is not reasonable to assume that this is spam. Two points I want to make about that. First of all, I think the fact is his receipt of it is a prima facie evidence. There's prima facie evidence that he received these and that ---- What is that? I mean, what is the prima facie evidence that you refer to? What is it? Well, I think based on ---- I mean, I think generally we assume that someone ---- let me back up. There's no evidence, except that they were sent. Right? Let me back up. Let me address your spam argument. I'm sorry. I ---- that's not what I wanted to say. In terms of ---- our argument is not that if you receive spam, that's enough. Our argument is that there is ---- that the affidavit presented evidence from which you could reasonably infer this was not spam. One is that the affidavit said this is the kind of material that is traded clandestinely. So clandestine is the opposite of spam. Spam means you just send it to random, arbitrary people. The email address to which it was sent was his own name, which kind of undercuts that. I don't think so. I mean, he's still not identifiable. You really don't know whether that represents his true name or not. You have no idea where in the world he lives from that. There's still a lot of anonymity. Well, sure. Of course, the Molenthaler emails were sent to a gay one dude, which, of course, doesn't give you anything about who he particularly is. Secondly, the affidavit had another ---- I think a lot of people assume that if it's on the Internet, it's clandestine. I mean, that's why it's a bulk phishing expedition when all of this pornography goes out and they're trying to get someone to bite. They send it in bulk to a whole lot of people. Well, there's a certain anonymity ---- So, sure, it's clandestine in the sense that these websites are disguised. They take elaborate precautions to protect themselves. The question, though, is, is the mere receipt of unsolicited pornography enough to give probable cause? And your answer is yes. No, my answer is not yes. First of all, this is not ---- Then where do we draw the boundary? Excuse me? Where do we draw the boundary? You're saying if it's images of young boys, then that's enough. No. I'm saying that there's not just receipt here. I'm saying there's a large quantity, not of pornography, but of child pornography, which is itself contraband. And there really, I think, is no basis for assuming that this type of images, images of very young children engaged in sexual conduct, is the kind of material sent via spam. It's not the same as adult pornography, which is legal. If this is sent to an unwilling recipient, there's a great risk to the sender that there's going to be an investigation initiated. I mean, many unwilling recipients of these kind of graphic images would call the offensive material. Secondly, there was no indication from the affidavit that these emails ---- Where's that in the affidavit? I'm sorry? Where's that in the affidavit? The affidavit describes the content of several of the emails as consisting of children engaged in oral sex, ---- No, no, no. I'm not talking about that. What I'm talking about is what you just said, is that we can presume, based on law enforcement experience, that people who receive this kind of material are going to contact law enforcement. That's not in the record. No, that's not in the record. That's not in the affidavit. No, that is not in the affidavit. But what I'm suggesting is that, unlike other spam, like adult pornography or advertisements for drugs or for mortgage lenders, there is a risk to the sender in sending this kind of spam because it is, in and of itself, contraband. Secondly, the affidavit did not present anything to suggest that these emails had any kind of business purpose. Both parties below cited cases to the Court suggesting that the vast majority of spam has a commercial purpose. Well, the ---- these emails were simply images. There's no indication that there was any kind of solicitation or any business purpose to these emails. Finally, the affidavit also indicated that this kind of material is traded among those with similar interests, further providing an inference that the Court could to unsolicited recipients. And finally, in addition to sending them to defendant, the Hutchings' emails were also sent to him at his screen name, which was Young Bottom 16. That screen name does suggest some sexual interest in children and further provides an inference to think that these emails were not being sent to random indiscriminate recipients, but to those with a known interest in child pornography. I think in addition to all of those five reasons from which the Court could make the reasonable inference that just by a fair probability that these were not unsolicited, in addition to the amount, in addition to the narrow focus, there were two other factors. One is that the defendant had links to two independent child pornography investigations. The district court itself said, excuse me, and this is at the excerpts at pages 243 and 44, the fact that Kelly's screen names were discovered in the course of not one, but now two child pornography investigations was significant because the more often that Kelly's screen name appears on computers of known child pornography traffickers, the less likely it appears to the Court that his receipt of the emails was unwitting or that the emails were unsolicited spam. The defendant would have you believe that his name came up during the course of these two investigations because he was just, this is just coincidence, he's very unlucky, I guess. But this Court, in according preference to warrants, as it's required to do under Illinois v. Gates, should rely on the inference so well articulated by the district court. And finally, the last factor is that, you know, the defendant was sent these emails at two different screen names and at two different times. Again, the district court recognized, quote, it becomes less likely that someone is an unwilling recipient when it happens on multiple occasions. So I, yes. So I was just going to say, I think all of those factors and the factors which undercut the reasonable belief that these were unsolicited was more than enough to support a finding of probable cause that contraband would be found in the defendant's residence. I understand that the district court was concerned that the identity of the senders of the nine emails wasn't known. But that aside, my question is just kind of clarification. There were, the emails reflected the five on the Hutchins and the four on the German computer, or vice versa anyway, reflect emails, transmissions with graphic images from nine different people? They were, in fact, from five different screen names. Each of the German, each of the Mumenthaler emails came from a different I probably misspoken. I said people. But there are five different screen names. Yes. Although the second warrant didn't indicate the senders on the Mumenthaler emails. I understand that. And then all of the five emails found on the Hutchins computers were from the same sender, BAD-AT-178. Okay. So there's one sender on the Kansas and four on the German. Yes. Although, as I say, that's not clear from the second warrant. But that's, in fact, true. Yes. Even the district court recognized, or we don't believe this is that close a case now that we have the benefit of Gord and would allow the court to use the totality of the circumstances to make the inference of knowledge, because I think that's similar to the inference of receipt that the court made in Gord. But even the district court believed it was a close case and said in its written order, this motion is a closer case than the first and more troubling for the court and indicated at the hearing that it was bothered by the cumulative effect of the evidence. Well, close cases go to the warrant. The Illinois v. Gates, the Supreme Court said the resolution of doubtful or marginal cases should be largely determined by the preference to be accorded to warrants. For these reasons, we would ask the court to reverse the district court suppression order, and I would like to save the remainder of my time for rebuttal, please. Thank you. Ms. Wall. Thank you. May it please the Court. Elizabeth Falk on behalf of the Federal Public Defender's Office and Mr. Kenneth Kelly. In a carefully drawn and narrow ruling specific to the facts of this case, the district court drew a very careful order that comports with the standard in Gates, holding that an excised warrant in this circumstance does not meet the probable cause standard. Well, one of the problems with that is that the district court, in effect, started and stopped with what wasn't known, what was not set out in the affidavit, instead of, as in Gord, starting with what facts are known. And so my question is, if you know from the affidavit that someone in Germany who was a known trafficker had copies of e-mails that were received by a screen address indisputably belonging to Kelly, and you know that the same thing is true of someone who was a known trafficker in Kansas, and you know that all of the material involved explicit sexual images of young boys in a certain limited age range, and you know that all of the material involved explicit sexual images of young boys in a certain limited age range, why isn't it reasonable to infer from that that Kelly was a participant, knowing participant in a network, as it were, of distribution of child pornography from which you can, in turn, infer that there was communication and connection among them of some sort having to do with the exchange of graphic images of this type? Before I answer you, I just need to clarify that the warrant was not that specific, the warrant application. Well, it did say the facts. I'm drawing the inferences. So you don't disagree with the facts that I recited. So what I'm asking you is, if you start from the known facts, why can't you, under Gord, then reasonably infer from what I just said, and why doesn't that then add up to a fair possibility that images are going to be found on the computer? I just want to say it's not all hardcore child porn, according to the warrant application. It's 15 child pornographic or erotica images. The same is true with the Kansas emails. We don't know how much of it is actual child pornography from the warrant. With that clarification, my answer is, you can't make that inference because we don't know what happened to the emails, because people who are on distribution lists for legitimate pornography or legitimate gay pornography or gay erotica, it is a reasonable inference that their name could be found by being a member of a legitimate pornography circle. That may be a reasonable inference, but why isn't it equally a reasonable inference that these folks all knew, because it's two people in two different countries. This is not like next door or whatever. This is two different people, two different countries getting emails from at least five different people, all ending up being sent to Kelly. Why couldn't you reasonably infer from that that he wanted the stuff? Again, we don't know it's five different people. Just to be true to the text of the warrant application. I think it's five different email senders. Well, we don't know it's even five different senders. It could have been one sender on the German email and one sender on the Kansas email. So limiting it to whether you're going to say four or one, it's not reasonable to infer that based on this application because we don't know anything about Mr. Kelly. Well, now, what do we have to look at here? Is it a reasonable inference that the computer in the Kelly residence would contain evidence of a crime? We're not – it's not a reasonable inference to arrest him, is it? It's not probable cause to arrest Kelly. Correct. We have a much lower standard here, a reasonable inference to search the computer. That's correct. Well, a reasonable inference that evidence of fruits or instrumentalities or evidence of a crime would be found in his computer. But, Justice O'Connor, the government needs information about Mr. Kelly because the logical inference is if you or I or a regular person received an email like that, we would delete it immediately. And in order for the government to find probable cause to arrest him. I don't know that that's right. And you have multiple images that I think certainly many of them represent the type of child pornography that would amount to contraband. There's no question about that. True. But for a warrant to be executed six months after the last known evidence. To look at the computer. To look at the computer. The computer was seized on February 9th of 2005. The last evidence in the warrant was that somebody sent Mr. Kelly something in August of 2004, six months later. The reason that other cases hold that that's fine from a staleness perspective is because these people are collectors and they hoard the stuff. You need to fit the profile in order for that inference that the stuff is still on the computer to hold. So is your, do you want to rest your case on the fact that this is stale or was too long a period of time? Is that what you, it boils down to? No, that's not what I'm resting my case on. I'm saying that in order for there, for the evidence, for there to be a reasonable probability that evidence of that crime would still be on Mr. Kelly's computer, there has to be some evidence under these circumstances that he wanted it and he was hoarding it. Because otherwise, if he was just a regular person who got regular gay pornography, he would have been repulsed by that and deleted it. And we expect citizen. Well, some people just leave it on their computers. They don't use their e-mails. I mean, there's a possibility he just sits there for a long period of time too. It's a possibility it was. Or goes into the spam account or the junk mail account. Exactly. Or that it was blocked by a spam blocker. Well, in fact, the evidence in this case that's in the AOL affidavit said that he did delete a number of these images. In fact, because they found it in his deleted accounts. That's right. Of course, that warrant isn't an issue. I know. I'm just saying. I fully agree with you, Judge Thomas. And there's no information in the warrant about recovering deleted e-mails. There's nothing in this expert opinion about technology that says, oh, we can get stuff out of deleted space or in Internet cache. This warrant rested. As we more or less said in Gord, you know, what you don't have to. This is all a fluid concept. And it's common sense. And you don't – it's a non-technical concept of probable cause. But the government is relying on expert opinions. For instance, that spam does not go of this nature to people who don't want it. And they're relying on that being the case. And it's not in the warrant. There's nothing wrong with that. That's a fair amount of common sense. Well, but the government is the one who's harping on spam more than I am. The district court found that there was not a fair probability that these e-mails were solicited because there is a very good chance that they were not solicited and that Mr. Kelly is simply on a regular pornography distribution center and happened to get sent these images as well. We don't know what other images were included in the e-mails. If we did, if it would change the face greatly, for instance, if we knew that there was a hundred adult images and five images of children. But affidavits are not required to put the mitigating circumstances in the report. And what the court found is under these narrow facts, how often are we going to see an excise warrant where the heart of the warrant, Mr. Kelly's AOL account, is out. And we're left with just evidence that his account was sent something. And there's no evidence in this warrant about Mr. Kelly except where he lives and the fact that he was sent something. The problem is that literally what you said isn't quite enough, because what you literally said was he got that there was evidence that he was sent something. I mean, there's evidence that from two different, very disparate sources, that his name was on two different or at least two different lists for the same very narrow kind of child pornography. And the government seeking to use the e-mails themselves is the only thing they try to rely on. It's an unprecedented decision the government is asking this Court to make that no circuit that I have seen or any district court has made that simple receipt from two different places. No one knows the district court decision, but never mind that, because it doesn't matter much. There are nine e-mails. That's what we're talking about, right? Right. Okay. There's nine e-mails. And it's over the course of an undetermined amount of time. I did not see the – what I'd like to get you to really focus on and answer for me, your argument for why it's not just nine e-mails. It's nine e-mails that were also sent to or sent by two known traffickers in child pornography. They were not sent by any known person. The senders are unknown. No, no. That at 178 is unknown. Mummenthaler and Hutchings were recipients. Yes. That's what I thought I said. Maybe I didn't. I may have misspoken. But he was – he's in that league. He was cc'd. It's the best inference we can make. Well, I think you – Why would he cc'd? That's more intentional than just getting it. It shows, to me, that there's a fair probability that somebody figured he wanted the same thing that Hutchings and Murmanthaler thought. Mummenthaler. Thank you. Easy for you to say. The standard under Gates is whether there's a fair probability that evidence of the crime is going to be found on Mr. Kelly's computer. Okay. Well, let's get specific to Judge Reiner's question. Mummenthaler is not alleged to be a trafficker, but it says he's got a lot of stuff. Yes. A lot of pornography. Now, Hutchings, on the other hand, they find it's probable cause to believe he'd been That's in the affidavit. Right. So the question is – let's leave Mummenthaler aside. Okay. If you are receiving – I think there's a question. Is it enough to take it out of the unsolicited e-mail genre to say that you have a known distributor and purveyor of child pornography via AOL e-mail accounts sending stuff – sending these e-mails to your client? Is that enough on the low standard of the threshold that we have under Gord? No, because Hutchings isn't sending the e-mails. It's BAD-AT-178. BAD-AT-178 could be an undercover officer doing a sting operation who's sending out a bunch of e-mails to suspected traffickers and CCing them all. We don't know who BAD-AT-178 is. BAD-AT-178 could be someone who looked up – who's been receiving legitimate porn and illegitimate child porn and says, Oh, I think I'm just going to CC this list and see who will bite and send me back. We don't know who BAD-AT-178 is. We just know he sent something to Youngbottom18, which is a fairly non-innocuous screen name, and K. Michael Kelly, a real name of a person who is interested in legitimate adult gay pornography, which wasn't in the warrant but is a fact. So when you consider that as a circumstance, that's what the district court's problem is. We don't know who BAD-AT-178 is. We don't know the purpose for which the e-mails were sent. And given, in this case, the dearth of evidence about Mr. Kelly, there's nothing. Other than the fact that these unknown people, for unknown purposes, sent Mr. Kelly. In two different countries. In two different – well, we don't know if it's two different countries. To when? Two different countries. Well, but e-mails can be sent – I could send an e-mail to Germany, an e-mail to Kansas from my computer in San Francisco, and Mr. Kelly's also in San Francisco. I mean, really, the two-continent issue is sort of a red herring, given the prevalence of the way e-mail circulates. We don't know. It's the fact that they're busted in two different countries doesn't really matter. All right. But we're still, at bottom, not looking at grounds for arresting Mr. Kelly. Correct. We're just looking to see if it's enough to search the computer. Well, there's not even any evidence in the affidavit that he has a computer or that he keeps his computer at his house. So if there is one there. If there is one there. But, again, it was connected to his screen name, not to his computer. What has happened? Is there a computer being held someplace? What happens? Well, you can – you can look. Where is this? Is there a computer being held that may have been Mr. Kelly's, that at the end of the day when we resolve this could be looked at? Absolutely, there is a computer that was seized at his residence. It was seized there. We do know that there was one from Kelly's residence that was seized, and it's still being held. Correct. Okay. Okay. And I understand your question, Justice O'Connor, which is it's not – it doesn't seem like it should be about Mr. Kelly. But here's why it is. It is about Mr. Kelly because when a normal individual receives an e-mail, oftentimes we read it and delete it. Now, sometimes we save them. It's important. But the only reason that this kind of disgusting – Well, can we – can we just take some kind of judicial notice of the fact that some of this material is so outrageously child pornography that it isn't the kind of thing that would be sent as spam. Sometimes one finds on one's home computer invitations to order things from suppliers of pornography, but they are images typically that are sent to you directly unless you pursue it and order them or you have contact with someone. Can we take judicial notice of that? I would argue no. No. Judicially noticeable facts should not be subject to reasonable dispute. And if the government wants to issue a warrant of this nature and they want to rely on the evidence, my argument is that there better be an expert talking in an affidavit about the study of spam and how, according to the affidavits, training and experience, this type of material is not ordinarily received as spam. If the government – The other part of it, I think, if expert testimony were allowed, is that if you respond by saying, please don't send this to me, you're going to get a lot more spam because they count on hits, not on the message, right? And if you keep saying to each attempted unsolicited receipt of pornography, please don't send it to this account, you're going to get 5,000 back, right? That's very true. I mean, that could be the expert. And spam is only part of the argument. I'm not just saying it's got to be spam or there's a reasonable probability. It's the fact that it's unsolicited, that this could have been sent by somebody because he found Mr. Kelly's name in a legitimate pornography exchange somewhere. And it's not just the fact that all of these images are of boys, of young boys, affect that assumption at all? Well, not if Mr. Kelly – They're all of one kind. Not if Mr. Kelly – So should we then assume it was some general legitimate porn site? Well, if I think I understand you correctly, if Mr. Kelly is gay, which he is, and if he's receiving gay adult pornography, that mitigates the government's argument that, oh, well, because this was all men on men or men on boys, we should believe that he knowingly reached out to get this. It would defeat their inference if these people found Mr. Kelly as a result of legitimate adult gay sites and then said, oh, well, I'm going to send him this to see if he'll send me something back. And the problem is the government wants to rest on this inference that spam can never be child pornography or this kind of thing never could happen without any affiant testimony on that in the warrant. This is something that could be easily fixed. And I'd like to also add – Well, would that solve the problem? If all they did was have a line in there that said, you know, this stuff isn't normally sent out as spam? It would have to be – It might get somebody the short end of an irate telephone call to the cops? No. It would have to be more than that. It would have to be a study, a study of how often these e-mails are unsolicited. I mean, this – I mean, from what I'm hearing you say, it would solve the problem if the affidavit explained a bit more about spam. That's not what I'm saying. There still, under these circumstances, would need to be something in Hay, an interest in young children, evidence he had a computer, in Lacy, evidence of downloading. In Rice, the case that the government cited, they didn't tell you that the court relied on the good faith exception in that case, which is not available here under United States v. Lacy. And the government also argued that the magistrate's entitled to deference. In an excise warrant situation, the magistrate never had an opportunity to pass on the validity of this warrant, because, of course, the magistrate authorized the warrant at a point where it was complete. And so in – there is a Fifth Circuit case that I provided to the court. United States v. Kolodziej is my best attempt at a pronunciation, which specifically says the magistrate's determination is not entitled to deference in an excise warrant situation. So in conclusion, the district court drew a narrow ruling. The district court is not seeking a bright-line rule that evidence of receipt can never be the basis for a warrant. In this particular case, it was not. Thank you. Thank you. Just a few points. First, let me just clarify a factual point, and that is that the affidavit does establish that Momenthaler was a trafficker. It doesn't say trafficker, does it? It doesn't use that word, but it indicates that on his computer it revealed 25 outgoing e-mails containing child pornographic attachments. Right. It proves the affidavit says basically it's a collector. It doesn't say he was distributing. The Hutchins says he was engaged in distribution. Unless I'm missing something, you're just asking for an inference, which is okay. But I don't think it says that. Well, I believe the fact that he has outgoing e-mails with attachments of child pornography does indicate that he's distributing the child pornography to others. Otherwise, you wouldn't see an outgoing e-mail. So I think it does indicate that he was not only receiving it, but was also distributing it. Right. My only point was it doesn't say that. He's not described as a trafficker. He's not described as a distributor. You have to read the inference. Hutchins, it says he was. Hutchins, on the other hand, said one probable cause believed he was receiving and distributing child pornography. That's specific in the affidavit. It's a small point, but I don't know. The point I want to make, Your Honors, is that there were the totality of the circumstances here allowed the reasonable inferences that he wanted the e-mails that he received. And I think the Court is right that the focus for the district court and for this court is not on what's not in the warrant, but what is there and what reasonable inferences can be made from it. And I think Gord makes that abundantly clear. And I do think that was part of the district court's error, not having the guidance of Gord, was being too focused on what was not there, as opposed to the reasonable inferences that could be made. And this is not – there were many circumstances surrounding the receipt that allow that inferences. There were several e-mails, different times, multiple senders, large quantities, graphic images that were clearly not in it. There are nine. There are nine e-mails. Nine e-mails. Right. Yes. There were a lot in the outbox of Momenthaler, but they hadn't been sent. Correct. Nine e-mails that the defendant received with the 53 images. And I think one mistake that we need to make sure we're not doing is conflating adult pornography with child pornography. There is a world of difference. Child pornography is in and of itself illegal. It's contraband that would authorize a warrant to search a location for, and there's simply no evidence to suggest that someone who receives adult pornography is more apt to get – is going to get contraband or be interested in contraband child pornography. I think one way to sort of sum this up is that, just as Frankfurter once said, the courts should not be ignorant as judges of what we know as men and women. What we know here is that someone who receives large amounts of child pornography of a singular focus of an extremely graphic nature at more than one screen name on multiple occasions probably receives it because he wants it. We'd ask you to reverse the district court's decision. Thank you. Thank you, counsel, both of you, for the matter and for your argument. And the matter just argued will be submitted and the court will then adjourn. All rise. Court is adjourned.
judges: O'connor, Rymer, Thomas